# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE ALTABA, INC. | ) ) ) | C.A. No. 2020-0413-JTL |

# OPINION

Date Submitted: October 5, 2020
Date Decided: October 19, 2020

Paul J. Lockwood, Arthur R. Bookout, Matthew P. Majarian, Gregory P. Ranzini, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Petitioner Altaba Inc.*

Albert H. Manwaring, IV, Kirsten A. Zeberkiewicz, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Claimant Droplets, Inc.*

Thad J. Bracegirdle, BAYARD, P.A., Wilmington, Delaware; *Attorneys for Claimant ESRT Empire State Building, L.L.C.*

Christopher P. Simon, Kevin S. Mann, David G. Holmes, CROSS & SIMON, LLC, Wilmington, Delaware; E.F. Anthony Merchant, Q.C., MERCHANT LAW GROUP LLP, Regina, Saskatchewan; *Attorneys for Claimant Emily Larocque.*

Evan W. Rassman, REGER RIZZO & DARNALL LLP, Wilmington, Delaware; Michael F. Long, WATKINS & LETOFSKY, LLP, Santa Ana, California; *Attorneys for Claimant State Farm General Insurance Company.*

Michael A. Pittenger, Berton W. Ashman, Jr., David A. Seal, POTTER ANDERSON & CORROON, LLP, Wilmington, Delaware; William Savitt, Adam M. Gogolak, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Claimants Verizon Communications Inc. and Oath Holdings Inc.*

A. Thompson Bayliss, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for California Franchise Tax Board.*

Laura D. Hatcher, THE UNITED STATES DEPARTMENT OF JUSTICE, Wilmington, Delaware; Richard E. Zuckerman, Dennis M. Donohue, Catriona M. Coppler, THE UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; *Attorney for Non-Party The United States of America.*

Carsten Rosenow, San Diego, California; *Pro Se Claimant.*

**LASTER, V.C.**

Petitioner Altaba, Inc. (the "Company") is pursuing dissolution under the framework established by Sections 280 and 281(a) of the Delaware General Corporation Law. The Company has moved for an order approving interim holdbacks and authorizing an interim distribution to stockholders. The language of Sections 280 and 281(a) does not contemplate interim distributions; those sections contemplate that determinations regarding the amounts of security sufficient to compensate creditors will be made after a final evidentiary hearing, akin to a trial, at which point the corporation can make a liquidating distribution. The Company's motion asks this court to make those determinations on a preliminary basis.

Despite the absence of express statutory authorization, this court has recognized that an interim distribution can be warranted. But the movant seeking approval for an interim distribution necessarily bears a heavy burden, because the motion asks for the equivalent of final relief. Once assets are distributed, they are no longer available to compensate the Company's creditors. It is also highly unlikely that any amounts distributed in reliance on a court order could be clawed back, or that the directors who authorized a distribution in reliance on a court order would face liability. A company seeking to make an interim distribution therefore should establish that its proposed reserves are sufficient as a matter of undisputed fact, analogous to a motion for summary judgment.

For all but two claims, the Company has agreed to hold back the full amount of security requested by the respective claimants. As to those claims, there is no dispute regarding the amount of security, and hence no obstacle to an interim distribution based on those amounts.

For two claims, the Company seeks to hold back less than the full amount of security requested by the claimants. The first claim relates to lawsuits pending in Canada resulting from data breaches that the Company disclosed in 2016 (the "Canadian Actions Claim"). There are two salient lawsuits pending in different provincial courts, both of which purport to be national class actions. In one of the actions, the pertinent court appointed a representative to negotiate an amount of security with the Company, and they agreed on $50 million. The pertinent court also certified a class for settlement purposes. The lawyers who filed the competing action dispute the amount of security, contending that a class-wide recovery could exceed $1 billion. They argue that it would prejudice their claims if this court authorized an interim distribution based on the far lower amount that was negotiated.

The assessment of potential outcomes for the Canadian Actions Claim turns on disputed issues of Canadian law and on developments in the Canadian actions that will unfold over the next three months. If this court were making a determination after the final hearing contemplated by Sections 280 and 281(a), and if it was not possible to await further developments in the Canadian actions, then this court would undertake the challenging task of predicting what the Canadian courts might do. For purposes of an interim distribution, that type of educated guesswork is both unwarranted and dangerous. There are too many disputed facts, too much uncertainty, and too much risk to creditors for the court to address this matter now, particularly when near-term developments in the Canadian actions may clarify matters. If the Company wishes to make an interim distribution to its stockholders, then it must reserve $1.05 billion Canadian for the Canadian Actions Claim.

The second claim relates to a breach of privacy lawsuit filed by Carsten Rosenow, who contends that the Company wrongly disclosed his private information to law enforcement authorities who investigated Rosenow for attempted solicitation of a child and possession of child pornography (the "Rosenow Claim"). Rosenow was indicted, convicted, and imprisoned, although his conviction remains subject to appeal.

A federal district court has dismissed Rosenow's breach of privacy lawsuit with leave to replead. In response to the Company's notice to creditors, Rosenow asked the Company to hold back $20 million as security for his breach of privacy claim. The Company proposes to hold back $50,000, noting that the buyer of the Company's operating business agreed to assume the defense of this claim and any responsibility for it, and further noting that if the amount currently reserved for other claims proves excessive, as seems likely, then the excess could be available for the Rosenow Claim. On the current record, the Company has made the strong showing necessary to establish that the amount of security it has proposed is sufficient for purposes of making an interim distribution.

The Company's request to make an interim distribution also puts at issue the amount that the Company proposes to reserve under Section 281(c)(3) for claims that have not been made known to the corporation or that have not yet arisen. Because this reserve must be sufficient for claims that are presently unknown, estimating an appropriate reserve is a particularly difficult task. To assist the court, Section 280 contemplates the appointing of a guardian *ad litem* for unknown claimants so that the court can have the benefit of adversarial presentations during the final hearing that the statute envisions. Through its motion, the Company seeks to accelerate the point at which the court must make its

3

estimate, moving it forward from the final hearing to a preliminary stage. And the Company asks the court to endorse its assessment without the benefit of anyone speaking on behalf of the unknown claimants.

Despite the serious challenges presented by the Company's positon, the Company has made a convincing showing, based on undisputed facts, that the amount that it proposes to reserve is likely to be more than sufficient to provide compensation for claims that have not been made known to the Company or that have not yet arisen. The undisputed facts that support this preliminary determination include (i) the Company's sale of its operating business three years ago, which resulted in the Company not having an operating business since then; (ii) the agreement by the buyer of the Company's operating business to assume responsibility for claims relating to that business; (iii) the absence of any claims against the Company for its conduct during the period in which it has operated as an investment fund; and (iv) the likelihood that by reserving the full amount requested by the claimants for contractual claims and claims presently in litigation (except for the Rosenow Claim), the Company has established excess reserves that can be reallocated to satisfy unknown claims should that prove necessary after the final hearing.

The Company is therefore authorized to make an interim distribution, on the condition that it reserves funds for the Canada Actions Claim in accordance with this opinion. Otherwise, the Company is authorized to make an interim distribution based on its proposed amounts of security.

4

## I.    FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with the Company's motion for an order approving interim holdbacks and permitting certain distributions to stockholders, including evidence submitted by affidavit. The court also has considered the parties' representations during the hearing on the motion.

### A.    The Company Sells Its Operating Business.

Until June 2017, the Company was known as Yahoo! Inc. During this phase of its existence, the Company was engaged in the business of providing web services to its users, offering a network of search, communications, and digital content, and using its data, content, and technology to connect advertisers with their target audiences.

In June 2017, the Company sold its operating business and nearly all of the attendant liabilities to Verizon Communications Inc. (the "Sale"). After the Sale, the Company's assets consisted primarily of 383.6 million shares of stock in Alibaba Group Holding Limited (the "Alibaba Shares"). In light of its new business model, the Company registered as a closed-end investment company under the Investment Company Act of 1940.

For nearly three years after the Sale, the board of directors of the Company (the "Board") managed the Company's investments. The Board ultimately determined that it was in the best interests of the Company and its stockholders to distribute the Company's net assets directly to them, either through a direct distribution or by monetizing its assets and distributing the proceeds.

## B. The Plan Of Dissolution

On April 2, 2019, the Board approved a Plan of Complete Liquidation and Dissolution (the "Plan of Dissolution"). On June 27, the Company's stockholders approved the Plan of Dissolution at a special meeting. When the Company sought stockholder approval for the Plan of Dissolution, it estimated that it would be able to pay all of its creditors in full and then make aggregate liquidating distributions of between $39.9 billion and $41.2 billion.

In June 2019, the Company began liquidating the Alibaba Shares. On September 23, 2019, the Company made a distribution to its stockholders of $26.75 billion, or $51.50 per share.

On October 4, 2019, the Company filed a certificate of dissolution with the Delaware Secretary of State. Since then, the Company has operated in accordance with the Plan of Dissolution, which contemplates an orderly wind-down of the Company's business. Under the Plan of Dissolution, the Company has completed the liquidation of the Alibaba Shares, sold a patent portfolio owned by one of its subsidiaries, and monetized the Company's other noncash assets.

## C. This Proceeding

The Board chose to pursue dissolution under the elective notice-and-consent regime authorized by Sections 280 and 281(a) of the Delaware General Corporation Law. "In barest outline," those sections "call[] for notice for the presentation of claims to the dissolved corporation; the rejection of, or the offering of security with respect to any claims presented; and the furnishing of notice of rights to petition for the appointment of a

6

receiver." *In re RegO Co.*, 623 A.2d 92, 97 (Del. Ch. 1992) (footnotes omitted). Sections 280 and 281(a) "created a detailed process, which involves judicial involvement, by which dissolving corporations can essentially smoke out claims, pay off claims in accordance with statutory priorities, and establish reserves for contingent claims." *Territory of U.S.V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 798 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008).

To that end, on October 4, 2019, the Company mailed notices to more than 400 potential creditors to notify them of the Company's dissolution and the deadline to assert a claim. On October 7 and 14, notice of the Company's dissolution was published in the *News Journal*, a newspaper of general circulation in the county where the Company's registered agent is located.

On May 28, 2020, the Company filed a petition seeking judicial determinations under Section 280. Through its petition, the Company seeks to establish the amount and form of security that is reasonably likely to be sufficient to provide compensation for

- claims that are the subject of a pending action, suit, or proceeding to which the Company is a party;

- other claims asserted in response to a notice provided under 8 *Del. C.* § 280(a)(i), for which the amount and form of security has not been agreed upon by the parties;

- other claims, if any, that are not barred under 8 *Del. C.* § 280 and have not been made known to the Company, or that have not yet arisen but are likely to arise or become known within five years after the date of dissolution of the Company; and

- costs and expenses through the completion of the wind-up process.

As of the date of the filing of the petition, the Company had received correspondence from sixty-eight claimants.

7

The Company moved to make an interim distribution to stockholders in an amount that the Company believes will be available for a liquidating distribution under any circumstances. To establish the amount of funds available for distribution, the Company either satisfied the claims it received or agreed to retain the full amount of security that the claimants requested, pending this court's final adjudication, after an evidentiary hearing, as to the amount of security required.

As noted previously, there are two claims for which the Company did not agree to hold back the full amount of security requested by the claimant: the Canadian Actions Claim and the Rosenow Claim. Through this motion, the Company seeks to make an interim distribution based on its proposed reserves for these claims and its proposed reserve for unknown claims.

## II.     LEGAL ANALYSIS

Before 1987, Delaware lacked a statutory procedure for assessing the potential claims that a dissolved corporation would face and establishing an amount of security that would be reasonably sufficient to satisfy those claims. Historically, the absence of a procedure "was not a cause of great concern because of the applicability of limitations periods and the relative ease of determining the existence and extent of such claims." 2 David A. Drexler et al., *Delaware Corporation Law and Practice* § 38.05[5], at 38-16 (2019). Over time, however, the scope of corporate liability expanded, particularly for mass torts, and the protection provided by statutes of limitation became less certain. *Id.* As a result, it became possible that large claims could materialize "years after the completion of the liquidation of the corporation whose activities caused the claimed injuries." *Id.* In that

8

eventuality, directors faced the risk that corporate claimants might be able to recover from them personally if the claimants could prove that the directors made distributions "in violation of a duty owed to the corporation's creditors on dissolution." *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at \*7 (Del. Ch. Feb. 28, 2006). And stockholders faced the risk that corporate claimants might seek to claw back the distributions they had received. *See* Drexler, *supra*, § 38.05[7], at 38-24 to 24.1.

In 1987, the Delaware General Assembly enacted Sections 280, 281, and 282, "at least in part, to provide a mechanism with which such uncertainty could be dissipated and fairness to future as well as present corporate claimants could be presently established through adjudication." *RegO*, 623 A.2d at 105. Those sections attempted "to afford fair treatment to foreseeable future, yet unknown, claimants of a dissolved corporation," while at the same time providing protection for directors and stockholders. *Transamerica*, 2006 WL 587846, at \*7.

"Sections 280 and 281 offer directors of a dissolved corporation two alternative pathways to discharge their fiduciary duties to existing and future corporate claimants: (1) the elective, court-supervised process under sections 280 and 281(a); or (2) the unsupervised, default procedure under section 281(b)." 3 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 280.01, at 10-131 (6th ed. 2016-2 supp.). "Compliance with either §§ 280–281(a) or § 281(b) shields directors and shareholders of the dissolved corporation from post-dissolution liability to third party claimants." *In re Krafft-Murphy Co.*, 82 A.3d 696, 706 (Del. 2013) (citing 8 *Del. C.* §§ 281(c), 282).

9

In this case, the Board elected to follow the procedures set forth in Sections 280 and 281(a). Those sections are designed to enable the directors of a dissolved corporation to "discharge their fiduciary duties to existing and future claimants, while also enabling the corporation to make distributions during its corporate winding-up activities." *Krafft-Murphy*, 82 A.3d at 705. The sections establish a court-supervised process under which a dissolving corporation

> (i) gives notice to persons with existing, contingent, conditional or unmatured claims;

> (ii) sets aside "security" both for pending, contingent, conditional or unmatured claims and for claims likely to arise or become known to the corporation within five years after the date of dissolution or such longer period of time as the Court of Chancery may determine not to exceed 10 years after the date of dissolution; and

> (iii) distributes to shareholders any assets that remain after claims have been paid or provided for as set forth in § 281(a).

*Id.* at 705–06 (formatting added) (footnotes omitted). If the directors of a dissolved corporation have followed this procedure, then "[t]he availability of [director] protection is much more certain" than it would be if the directors instead had followed the unsupervised, default procedure set forth in Section 281(b).[1]

---

[1] Drexler, *supra*, § 38.05[6], at 38-24; *see Krafft-Murphy*, 82 A.3d at 701, 702–03 (stating that Sections 280 and 281(a) "enable the corporation's shareholders and directors to avail themselves of a 'safe harbor' from post-dissolution liability"); *see also RegO*, 623 A.2d at 97 ("[C]ompliance with subsection (b)'s standard, 'reasonably likely to be sufficient' will, in principle at least, always be litigable. Thus, reliance upon the mechanism of Section 281(b) may present a risky situation for corporate directors regardless of their good faith and due care.").

Sections 280 and 281(a) thus require that the Court of Chancery determine (i) "the amount and form of security that 'will be sufficient' with respect to any contract claim that is contingent, conditional or unmatured (excepting claims on implied warranties)," and (ii) "the amount and type of security 'which will be reasonably likely to be sufficient to provide compensation' for all other [*i.e.*, non-contractual] future claims 'that have not arisen but that based on facts known . . . are likely to arise . . . .'" *RegO*, 623 A.2d at 97–98 (alteration and omissions in original) (footnotes omitted). At the final hearing, the burden is on the Company to establish the amounts and forms of security that will satisfy the statutory tests.[2] The Company did not dispute the logical conclusion that because it would have the burden at the final hearing, it also bore the burden on its motion.

## A.    Interim Distributions Under Sections 280 And 281(a)

Sections 280 and 281(a) do not contemplate interim distributions. *See* 8 *Del. C.* §§ 280, 281(a). The only distribution that the statute contemplates is of "assets that remain

---

[2] *See Boesky v. CX P'rs, L.P.*, 1988 WL 42250, at *17 (Del. Ch. Apr. 28, 1988) (Allen, C.) (concluding "that where a liquidating trustee elects to distribute assets to partners in respect of the partnership interest before either all creditors have been paid, or actually funded (i.e., dollar for dollar) and segregated reserves for their claims have been established, it is the burden of such liquidating agency to persuade a court that adequate security for the payment of such claims has been provided"). The *Boesky* case involved a proposed partial liquidating distribution of a limited partnership rather than a corporation. Chancellor Allen, however, analyzed that case "in light of the 1987 amendments to the DGCL, which began crafting the dissolution provisions as they exist today," because the same central consideration was at play: "the protection of creditors in the end-game of an entity's existence." *In re Delta Hldgs.*, 2004 WL 1752857, at *8 n.54 (Del. Ch. July 26, 2004). "Moreover," Chancellor Allen's reasoning in *Boesky* "comports with the form of review [that Chancellor] Allen performed in *In re RegO*." *Id. See generally* Drexler, *supra*, § 38.05[5], at 38-20 to -21 (discussing *Boesky* in the context of Section 280).

11

after claims have been paid or provided for as set forth in § 281(a)." *Krafft-Murphy*, 82 A.3d at 706.

Nevertheless, as this court recognized recently, "an interim distribution may be proper." *In re Swisher Hygiene, Inc.*, 2020 WL 3125415, at *2 (Del. Ch. June 12, 2020). Before a court approves an interim distribution, however, the grounds for doing so must be clear.

First, a powerful showing is necessary because any grant of interim relief that effectively operates as final relief generally should be based on a record that would support a grant of summary judgment.[3] The approval of an interim distribution operates in substance as a grant of final relief. Once a court-approved interim distribution is made, it

---

[3] *See, e.g.*, *Stahl v. Apple Bancorp. Inc.*, 579 A.2d 1115, 1120 (Del. Ch. 1990) ("Where plaintiff seeks not merely mandatory relief, but final relief—in the sense that a result after trial could not practically reverse the grant of preliminary relief—then absent an extraordinary circumstance, the court ought not to grant such relief where material facts are in substantial dispute.") (Allen, C.); *TW Servs. v. SWT Acq. Corp.*, 1989 WL 20290, at *6 (Del. Ch. Mar. 2, 1989) (explaining that a request for interim relief which would effectively "constitute final relief" should not be granted unless the movant "satisfies the standards applicable to a grant of summary judgment"); *City Capital Assoc. Ltd. v. Interco, Inc.*, 551 A.2d 787, 795 (Del. Ch. 1988) (Allen, C.) (holding that, when preliminary injunctive relief sought would, in effect, constitute final relief, it should not be awarded unless plaintiff can demonstrated that it is warranted based upon facts not legitimately in dispute); *see also Data Gen. Corp. v. Digital Computer Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972) (observing that "preliminary injunctions which allow the plaintiff all the relief he could hope to gain [after trial] are rarely granted"); *Dunkin Donuts, Inc. v. O'Connor*, 1994 WL 178142, at *2 (Del. Ch. Apr. 28, 1994) (noting that the movant had requested a form of interim relief that would change the status quo and be "effectively final in character"; observing that relief of that kind "normally will not be granted except after a final hearing"); *Thomas C. Marshall, Inc. v. Holiday Inn, Inc.*, 174 A.2d 27, 28 (Del. Ch. 1961) (observing that granting party's application for interim relief "would be to allow [that party] all the relief it might hope to gain after final hearing and this is rarely done").

is highly unlikely, bordering on impossible, that the money could be clawed back from the stockholders. Delaware law does not recognize "an open-ended obligation on the part of stockholders of dissolved corporations to return distributions they had received from the dissolved corporation whenever a post-dissolution claimant can prove that the corporation owed it funds based on its pre-dissolution activities." *Territory of U.S.V.I.*, 937 A.2d at 789. It is equally unlikely that directors who relied in good faith on a court order approving an interim distribution would be liable for the claims of a creditor left with inadequate security. *Cf.* 8 *Del. C.* § 141(e). Thus, once a corporation makes an interim distribution, the money is gone, and other avenues of relief are unavailable. If the court errs in approving the interim distribution, there is no realistic way to fix the problem later.

Second, a powerful showing should be required because the approval of an interim distribution accelerates the point in the proceeding at which the court must make what is already predictive determination. Section 280 requires that the court estimate the likelihood of future events and quantify a reasonable amount of security. An observation attributed variously to Mark Twain, Yogi Berra, and Niels Bohr (among others) holds true for dissolution: It's difficult to make predictions, especially about the future. Section 280 contemplates that the court will ground its estimates on a full evidentiary record, with the benefit of expert analysis as needed and with the possibility of assistance from a guardian *ad litem* to represent unknown claimants. *See* 8 *Del. C.* § 280(c)(3). The risk of error necessarily increases if the prediction is made early in the case, without those benefits. When signing off on an interim distribution, a court is forced to predict what its predictive determination might be, with limited if any ability to correct matters later if the evidence

13

at a final hearing indicates that the initial prediction was imprudent. To minimize the risk of error, interim distributions should be limited to scenarios in which the company's potential exposure is quite clear.

The scant pre-*Swisher* precedent suggests that interim distributions generally must be supported by an undisputed record. The *Swisher* decision cited two orders that had approved interim distributions: *In re Sobieski Bancorp, Inc.*, 2006 WL 4782384 (Del. Ch. Aug. 14, 2006), and *In re Geomet, Inc.*, 2017 WL 319053 (Del. Ch. Jan. 20, 2017). Both orders granted unopposed applications for an interim distribution. Indeed, in both cases, no one appeared to object at any point during the proceedings. In this case, the Company found a third order: *In re MedCath Corp.*, 2015 WL 581439, at *2 (Del. Ch. Feb. 11, 2015). That application also was unopposed, with no one appearing to object at any point.

The facts of *Swisher* reinforce the conclusion that an interim distribution should require a clear showing analogous to a motion for summary judgment. There, the company contested the claims of six potential creditors and sought leave to make an interim distribution. The court found that although one of the claimants might have a viable claim for fraud against the company's controller, the claimant was not a creditor of the company itself, so no reserve was necessary for that claim as a matter of law. 2020 WL 3125415, at *2. The court found that two other claimants had not substantiated their claims or opposed the company's motion for an interim distribution, so no reserves were warranted there either. *Id.* at *3. A fourth claimant sought to recover just over $4,000 from the company, and the company consented to a reserve in this amount. *Id.* at *2.

14

For the remaining two claimants, the court analyzed the strength of the claims in more detail. One claimant had opted out of a securities class action lawsuit. In his claim, he asserted vaguely that he planned to sue the company for "Fraud, Negligence, Breach of Fiduciary Duty, and several other claims," none of which included securities fraud. *Id.*. The claimant had not presented any meaningful evidence to substantiate his claim, and the court concluded that any claim he asserted would likely be time-barred. The court therefore held that the company need not reserve any amount. *Id.* at *2–3.

The other claimant had filed three lawsuits against the company and opposed the company's motion for an interim distribution, arguing that "*any* distribution would reduce the value of its potential judgment in" those suits. *Id.* at *3. The parties had entered into a tentative settlement agreement, under which the company would pay $1.8 million in cash and transfer two product lines to the claimant. *Id.* The claimant valued the tentative settlement at between $6.9 million and $9.2 million, while the company valued the tentative settlement at $1.667 million. *Id.* The court approved the company's proposed interim distribution, noting that it would leave the company with "a total of around $7.94 million of liquid assets," which the court found would be "reasonably, in fact amply, likely" to satisfy any judgment obtained by the claimant. *Id.* at *4.

The *Swisher* decision thus involved only one claimant with potentially meritorious claims of uncertain value, and although the claimant placed a high cash value on the claims, the claimant had agreed to a tentative settlement that predominantly involved non-monetary consideration. The court implicitly endorsed the corporation's reserve by approving the motion for an interim distribution, but the court noted that the corporation

15

would retain $7.94 million in assets, which the court regarded as more than sufficient to satisfy its obligations, presumably including unknown claims. The *Swisher* decision is therefore consistent with a conservative approach to interim distributions.

**B.      The Request For An Interim Distribution In This Case**

Here, the Company seeks an order that would authorize an interim distribution before the completion of the court-supervised, elective procedure contemplated by Sections 280 and 281(a). The Company seeks to distribute approximately $5.6 billion to its stockholders, leaving it with assets of around $7.3 billion. The amount of remaining assets is facially large, but it cannot be considered in a vacuum.

The quantum of assets that the Company will have after the distribution must be compared with the claims that the Company faces. Section 280 contemplates three categories of security that the Company must establish:

- For claimants who have asserted claims that are the subject of pending litigation, the Company must establish an "amount and form of security that will be reasonably likely to be sufficient to provide compensation for [each] claim." 8 *Del. C.* § 280(c)(1).

- For holders of contingent, conditional, or unmatured claim who have rejected the company's offers of security, the Company must establish an "amount and form of security that will be sufficient to provide compensation" for each claimant. 8 *Del. C.* § 280(c)(2).

- The Company must also establish security in a form and amount that is reasonably likely to be sufficient to provide compensation for claims that are *not* presently know to the corporation or which have *not* yet arisen but which, "based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 5 years after the date of dissolution or such longer period of time as the Court of Chancery may determine not to exceed 10 years after the date of dissolution." 8 *Del. C.* § 281(c)(3) (emphasis added).

16

For all but two of the known claims, the Company has proposed to retain the full amount of security requested by the respective claimants. For those claims, the amount of security is sufficient because it represents the full amount that the respective claimants seek. By taking that step, the Company has ensured that for purposes of those claims, the request to make an interim distribution is supported by undisputed facts.

The Company has disputed the amount of security necessary for two known claims, both of which relate to pending litigation. The Company also has proposed to retain $250 million to fulfill the statutory mandate in Section 281(c)(3) to provide for claims that are not presently known to the corporation or that have not yet arisen.

### 1. The Canadian Actions Claim

The first disputed claim is the Canadian Actions Claim. It relates to three data breaches that the Company disclosed in 2016, before the sale of its operating business. In Canada, the Company is a defendant in six lawsuits relating to the data breaches. Two of those lawsuits have assumed significance for purposes of the current motion: (i) *Karasik v. Yahoo! Inc.*, No. CV-16-566248-00CP, which is pending in the Ontario Superior Court of Justice, (respectively, the "Ontario Action" and the "Ontario Court") and (ii) *Larocque v. Yahoo! Inc.*, No. QBG-1242, which is pending in the Queen's Bench of Saskatchewan (respectively, the "Saskatchewan Action" and the "Saskatchewan Court"). This opinion refers to the Ontario Action and the Saskatchewan Action together as the "Canadian Actions."

Determining an appropriate reserve for the Canadian Actions Claim is complicated because Canada handles class actions differently than the United States. In the United

States, federal law "authorizes the Judicial Panel on Multidistrict Litigation [] to transfer civil actions 'involving one or more common questions of fact . . . to any district for coordinated or consolidated pretrial proceedings' in order to 'promote the just and efficient conduct of such actions.'" *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 410 (2015) (omissions in original) (quoting 28 U.S.C. § 1407). As a result, when numerous plaintiffs initiate class actions in different jurisdictions against the same defendants that arise out of the same conduct, those actions often are consolidated into one multidistrict litigation in a single district court.[4] Consistent with this procedure, the numerous cases filed against the Company in United States federal courts based on the data breaches were consolidated and proceeded in the United States District Court for the Northern District of California.

Canada does not have an equivalent to the Judicial Panel on Multidistrict Litigation, nor does it have a transfer statute to facilitate the consolidation of cases. *See* Dkt. 36 ¶ 10. Under Canadian law, "civil claims (including class action claims) are more often than not determined by a provincial Superior Court, and there is no coordinated 'federal' system for

---

[4] *See* Zachary D. Clopton, *MDL As Category*, 105 Cornell L. Rev. 1297, 1303 (2020) (describing the role of the Judicial Panel on Multidistrict Litigation in managing the multidistrict litigation process). Since the enactment of Section 1407, multidistrict litigation in the United States "has evolved from a disfavored judicial backwater to the dominant form of complex litigation procedure." *Id.* at 1298 (internal quotation marks omitted); *see* Jay Tidmarsh & Daniela P. Welsh, *The Future of Multidistrict Litigation*, 51 Conn. L. Rev. 769, 771 (2019) ("In its first nine years, the Judicial Panel on Multidistrict Litigation consolidated fewer than 5,600 federal civil actions in total. Today, however, the MDL process is arguably *the* central feature in federal litigation. Over the past five years, the Judicial Panel has consolidated an average of slightly more than 42,100 civil actions each year." (emphasis in original) (footnotes omitted)).

class action proceedings." Dkt. 50 ¶ 11. "Each province (except Prince Edward Island) has its own separate and distinct class action legislation prescribing the practice and procedures for certifying class proceedings and carrying them through common issues trials and individual issue resolutions."[5] "In Canada, there is no procedural or systemic bar to preclude multiple proposed representative plaintiffs from commencing separate claims in different provinces relating to the same underlying factual circumstances," nor is there a "procedural or systemic bar to multiple class actions being certified in multiple jurisdictions in respect of the same underlying facts."[6] If a class action in one jurisdiction overlaps with a parallel proceeding in a sister jurisdiction, then Canadian courts will coordinate to prevent double recovery by persons who are members of both classes. *See* Dkt. 46 ¶¶ 21–22; Dkt. 50 ¶ 28.

The Ontario Action was filed on December 16, 2016. The Ontario Court scheduled two hearings on the plaintiffs' motion for class certification—one in November 2019 and another in March 2020—but canceled both hearings pending ongoing settlement negotiations between the parties. Shortly thereafter, Emily Larocque filed the Saskatchewan Action.

---

[5] Dkt. 50 ¶ 12. "In Saskatchewan, *The Class Actions Act*, S.S. 2001, c. C-12.01 . . . governs." *Id.* ¶ 13. "In Ontario, the *Class Proceedings Act, 1992*, S.O. 1992, c. 6 . . . governs." *Id.* ¶ 14.

[6] Dkt. 50 ¶ 27. *But see* Dkt. 46 ¶¶ 15–23 (describing efforts by Canadian courts to avoid certifying partially or fully overlapping classes and to coordinate with sister provinces on multijurisdictional class action lawsuits).

On July 6, 2020, the parties to the Ontario Action signed a settlement agreement. Under the proposed settlement agreement, the Company agreed to pay approximately $20.3 million Canadian, or approximately $15.4 million in U.S. dollars, to settle the claims asserted by the class members, inclusive of legal fees and administrative expenses. The proposed settlement was conditioned on "the Saskatchewan [A]ction being permanently stayed or dismissed as a class action (although it may continue as an individual action)." Dkt. 36 Ex. 1 at 9, ¶ 40.

Before certification in the Ontario Action, the plaintiffs in that case sought and obtained an order from the Ontario Court that authorized putative class counsel for the Ontario Action to negotiate with the Company for purposes of this Section 280 proceeding (the "Ontario Representative"). The Ontario Representative and the Company agreed to a reserve of $50 million as security for the Ontario Action.

The Ontario Court subsequently granted provisional certification of a class for settlement purposes only. The Ontario Court appointed the Ontario Representative to serve "as counsel to the Settlement Class." *Id.* at sched. 1 ¶ 5. The parties to the Ontario Action will present the proposed settlement to the Ontario Court in a hearing that is currently scheduled for January 2021. At the hearing, the Ontario Court will evaluate the fairness of the proposed settlement and either approve or reject it.

If the Ontario Action were the only proceeding pending in Canada, then this court would regard as dispositive the order of the Ontario Court that authorized the Ontario Representative to negotiate an amount of security. The Ontario Representative's agreement

20

to an amount of security would be sufficient to support the Company's request in this proceeding.

Unfortunately, the Ontario Action is not the only action pending in Canada. There is also the Saskatchewan Action. The law firm representing the plaintiff in that action ("Larocque's Counsel") appeared in this case and objected to the sufficiency of the agreement regarding security, arguing that it was grossly insufficient. In calculating the value of the claims in the Saskatchewan Action, Larocque presented the following evidence:

- Four Canadian provinces—British Columbia, Saskatchewan, Manitoba, and Newfoundland—have privacy legislation that creates actions in tort for breach of privacy without proof of damages. Claimants in these four provinces thus potentially would be entitled to damages and other relief, including per se damages, even if they cannot prove actual losses. Ontario does not have analogous privacy legislation, meaning that the plaintiffs in the Ontario Action cannot seek per se damages. Dkt. 36 ¶ 27(a).

- Together, those four Canadian provinces have a combined population that represents 21% of the total population of Canada. The Company has estimated that the Canadian class as a whole would consist of around five million members. *See id.*; Dkt. 36 Ex. 2. Assuming that approximately 21% of those members live in either British Columbia, Saskatchewan, Manitoba, or Newfoundland, then 1.05 million class members could be entitled to per se damages. Dkt. 36 ¶ 27(c).

- Canadian courts have awarded per se damages for privacy violations of between $1,000 and $3,500 Canadian. *Id.* ¶ 29 & nn.21–23 (collecting authorities).

- Using these damages estimates, the recovery for the class members living in British Columbia, Saskatchewan, Manitoba, or Newfoundland could range from $1.05 billion to $3.68 billion Canadian, or $800 million to $2.8 billion in U.S. dollars. *Id.* ¶ 29. And that figure does not take into account the damages that members residing in one of Canada's other provinces potentially could prove.

Larocque's Counsel concludes that security of $50 million is not "reasonably likely" to satisfy the Canadian Actions Claim. *Id.* ¶ 35. Larocque's Counsel instead asks the court to

hold back $1.05 billion Canadian, or $800,000 in U.S. dollars, at least until additional rulings are received from the Canadian Courts. *Id.*

Further complicating matters, the Saskatchewan Court has not yet formally appointed Larocque's Counsel as class counsel, nor has the Saskatchewan Court certified a class. When the motion for approval of an interim distribution was presented, a hearing had been scheduled in the Saskatchewan Action for November 25 through 27, 2020, on Larocque's motion for class certification. Larocque's Counsel anticipated that during the hearing, the Saskatchewan Court also would determine whether it should stay the Saskatchewan Action in deference to the Ontario Action. After the hearing, the Company reported that the Saskatchewan Court had canceled the November hearing and informed the parties that the hearing would be rescheduled after the Ontario Court had rendered a decision on whether to approve the settlement in the Ontario Action.

The dueling Canadian Actions create a conundrum for this proceeding. It is possible that the Ontario Court will approve the settlement and that the Saskatchewan Court will defer to that resolution. In that event, substantial certainty will exist as to the outcome in Canada (presumably subject to some possibility of appeal). It is also possible that the Ontario Court will reject the settlement. If so, then the litigation in Canada will continue, either as a single nationwide class action if the Saskatchewan Court defers to the Ontario Court, or as two parallel class actions—a possibility for which there is substantial precedent. *See* Dkt. 46; Dkt. 50. It is also possible that the Ontario Court will approve the settlement and that the Saskatchewan Court will determine that the settlement is inadequate

22

to satisfy victims of the data breaches in Saskatchewan, such that further proceedings are necessary in the Saskatchewan Action.

If this Section 280 proceeding had reached the final hearing on the merits, and if it were necessary to determine the amount of security that would be sufficient for the Canadian Actions Claim before any further proceedings took place in Canada, then this court would have to make a probabilistic judgment as to how the Canadian Actions would turn out. But this Section 280 proceeding is not at that stage. It is at a preliminary stage, with the Company seeking to advance the decision-making process so that it can make an interim distribution to its stockholders.

Under these circumstances, there is no need to hazard a guess about what will happen in the Canadian Actions. If this court declines to make that determination now, then the Company's stockholders will have to wait an additional six to eight months to receive a portion of the funds that the Company currently wants to distribute. There is no exigency requiring the Company to distribute the money now, nor is the prospect of a final hearing in this matter so distant that it would be unfair to allow the Section 280 process to unfold as the text of the statute envisions.

Equally important, if this court waits, then it will have more information on which to base its decision. By the time of the final Section 280 hearing, the Ontario Court likely will have ruled on the settlement, and the Saskatchewan Court likely will have ruled on what it will do in response. This court also would benefit from a more thorough presentation from experts in Canadian law. This court will not have to make a doubly

23

predictive judgment that attempts to anticipate what the evidence will show about the future once this matter reaches a final hearing.

The Company argues that by not ruling immediately, this court shows disrespect to the Ontario Court, which appointed the Ontario Representative to negotiate security for purposes of the Ontario Action. This court certainly intends no disrespect toward the Ontario Court. To reiterate, if the Ontario Action were the only class action pending in Canada, then this court would view the designation of the Ontario Representative and the agreement on security as dispositive. But the Ontario Action is not the only action relating to the data breaches, and this court also wishes to show respect to the Saskatchewan Court, as well as to a sister democracy that uses a different system for administering class actions. Most significantly, this court wishes to avoid making too hasty a decision based on an inadequate record.

As fiduciaries who owe duties to the Company for the ultimate benefit of its residual claimants, the Board understandably wants to maximize the amount of the interim distribution that the Company can make to its stockholders. Because the Company is a solvent entity, that is the direction in which the Board's duties ultimately run. But Section 280 requires balancing the interests of stockholders with the interests of creditors and other claimants. The Company's stockholders already have received significant value from the Company. Between dividends, stock buybacks, and a self-tender offer, the Company has distributed nearly $45 billion in cash to the stockholders over the last four years. The Company also has made in-kind distributions of shares of stock in Alibaba. The risk of undervaluing the Canadian Actions Claim and curtailing the ability of those potential

24

claimants to recover amounts to which they are entitled outweighs the Board's interest in providing additional value to the stockholders immediately, particularly given that more information about the Canadian Actions will become available soon.

For purposes of the interim distribution, the Company shall reserve $1.05 billion Canadian for the Canadian Actions Claim. This amount is not a valuation, nor does it reflect any determination by this court about the likely outcome in the Canadian Actions. It rather reflects the amount of security which, at this stage of the proceeding, is necessary to permit an interim distribution to be made based on undisputed facts.

## 2. The Rosenow Claim

The second disputed claim is the Rosenow Claim. On June 21, 2017, Rosenow was arrested for possession of child pornography, attempted solicitation of a child, and other crimes. On October 19, he was indicted for those crimes. His criminal trial took place in August 2019, and on August 30, a jury found him guilty of attempted sexual exploitation of a child and possession of images of minors engaged in sexually explicit conduct. The court sentenced Rosenow to 300 months' imprisonment. Rosenow has appealed his conviction. He is currently incarcerated at a federal correction institution in California.

Rosenow claims that the Company violated his privacy rights by aiding law enforcement authorities in their investigation, including by disclosing his chats, emails, and messages. He sued the Company in the United States District Court for the Southern District of California (the "California District Court"), asserting claims arising under federal and California law and seeking to recover "general and compensatory damages," "punitive and exemplary damages," "civil penalties," and "attorneys' fees and costs." *See*

25

Pet. Ex. 12; Dkt. 17. The California District Court dismissed Rosenow's complaint without prejudice, granting him leave to replead.

After receiving the notice of dissolution from the Company, Rosenow sent back a partial copy of his complaint. The partial copy did not specify a damages figure, and Rosenow did not identify an amount of security that he wanted the Company to retain. Rosenow later asked the Company to reserve $20 million for his claim.

The Company has rejected Rosenow's claim in its entirety. The Company nevertheless proposes to reserve $50,000 for the claim. The Company notes that Verizon has agreed to accept full financial responsibility for defending the claim, including for any adverse judgment.

During the hearing on October 5, 2020, counsel for the Company represented that it would earmark $20 million of its $250 million reserve for the Rosenow Claim, "so that he has $20 million waiting for him if he could prove that claim." Tr. 14–15. How this allocation would operate is unclear because the Company also consistently represented that it had reserved $250 million for unknown claims as required by Section 280(c)(3). The Rosenow Claim is a known and asserted claim, so it does not fall within the category of unknown claims, and the effect of the allocation would be to reduce the total security available under Section 280(c)(3).

Regardless, the Company has shown that its proposed reserve of $50,000 provides sufficient security, particularly in light of Verizon's agreement to assume financial responsibility for the Rosenow Claim. There is some uncertainty about the potential outcome of the Rosenow Claim, but the Company's showing reaches the level of proof that

26

would be sufficient to grant summary judgment. Accordingly, this court approves the Company's proposed reserve without any need for a reallocation from the $250 million set aside for unknown claims.

### 3. The Company's Proposed Reserve For Unknown Claims

Under Section 280(c)(3), the Company must set aside an

amount and form of security which will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 5 years after the date of dissolution . . . .

8 *Del. C.* § 280(c)(3). The Company has proposed to set aside $250 million for this purpose.

It is exceedingly difficult to assess the Company's proposal at this preliminary stage. The Company has not offered any expert report or other calculation to support the amount of security that it has designated. During the hearing, Company counsel could not explain how the Company arrived at this number, other than representing that management came up with it and the Board approved it. *See* Tr. 23–26. Company counsel argued that $250 million was "an enormous number" and "a lot of money" that will leave unknown, future claimants with "no risk at all." Tr. 24.

Section 281(c)(3) does not envision that the court will accept the Company's say so, much less at a preliminary stage. The statute anticipates a hearing on the merits, and it authorizes the court to "appoint a guardian ad litem in respect of any such proceeding brought under this subsection" to represent the interests of unknown claimants. 8 *Del. C.* § 280(c)(3). The statute contemplates that "[t]he reasonable fees and expenses of such

27

guardian, including all reasonable expert witness fees, shall be paid by the petitioner in such proceeding." *Id.*

This court has considered whether to deny the motion for an interim distribution based on the absence of expert analysis or other reasoned support for the reserve for unknown claims. But in spite of the court's concerns, the Company has shown based on undisputed facts that the amount of the reserve for unknown claims is sufficient to support an interim distribution. The Company sold its operating business three years ago and has not had an operating business since then. To the extent that there would be unknown, future claims that emerge, they would relate to the Company's operating business, and Verizon has agreed to assume responsibility for those claims. Since selling its operating business, the Company has operated as an investment fund, and no fund-related claims have been asserted against the Company.

It is also important that for all of the claims other than the Rosenow Claim, the Company has established reserves equal to the maximum amount requested, and this court has required that the Company reserve $1.05 billion Canadian for the Canadian Actions Claim. It seems highly unlikely that the Company will be forced to pay out the full amounts of security that it has reserved for every one of these claims. If the evidence at the final hearing supports the need for a larger reserve for unknown claims, then the Company should be able to reallocate some amount from its interim reserves for known claims.

Taken as a whole, those undisputed facts indicate that the $250 million reserve is ample. The Company may therefore use a reserve of $250 million for unknown claims for purposes of making an interim distribution.

28

### III.      CONCLUSION

The Company shall reserve $1.05 billion Canadian for the Canadian Actions Claim before making an interim distribution. Otherwise, the Company may make an interim distribution using its proposed amounts of security.